IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 7, 2012 Session

**FREDRICK MILAN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 04-01712     J. Robert Carter, Jr., Judge**

_____

**No. W2011-02217-CCA-R3-PC  - Filed January 30, 2013**
_____

Petitioner, Fredrick Milan, appeals the dismissal of his petition for post-conviction relief in which he alleged that he received ineffective assistance of trial counsel.  More specifically he contends that (1) trial counsel failed to convey a twenty-five year offer by the State; and (2) trial counsel failed to call certain witnesses to testify at trial.  After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel, and we accordingly affirm the judgment of the post-conviction court.

**Tenn.R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Michael E. Scholl, Memphis, Tennessee, for the appellant, Fredrick Milan.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; Stephanie Johnson, Assistant District Attorney General; Betsy Weintraub, Assistant District Attorney General; and Marline Iverson, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Petitioner, Fredrick Milan, was convicted of the aggravated assault and first degree premeditated murder of the victim, Pamela Stafford, and was sentenced to consecutive sentences of five years and life, respectively.  In the light most favorable to the State, the

proof presented at trial established the following. The victim and Petitioner lived together. Petitioner had been arrested on September 26, 2002, for cutting the victim with a knife, which resulted in his arrest for aggravated assault. After that, the victim left the apartment and did not return until November 5, 2000. One witness testified that the victim was supposed to marry someone else on November 9, 2002. On November 6, 2002, the victim and Petitioner got into an argument while traveling in a white Cadillac Escalade, and Petitioner stopped the vehicle at the intersection of Highway 64 and Houston Levy Road in Shelby County. As the victim attempted to exit the passenger-side of the vehicle, Petitioner shot her. The victim got out of the vehicle bleeding and clutching a pillow, and she attempted to walk away. Petitioner got out of the Escalade and ordered the victim back inside the vehicle. As she continued to walk away, Petitioner shot the victim in the back. The victim fell on her back and attempted to get up, but Petitioner stood over her and shot her again. Petitioner then walked over and spoke to a man at a nearby gas station and then got back into the Escalade and fled the scene. Petitioner testified at trial and claimed that the shooting was an accident. *State v. Fredrick Milan*, 2008 WL 4378172 (Tenn. Crim. App. Sept. 26, 2008) *perm. app. denied* (Mar. 23, 2009). On direct appeal, this Court affirmed the murder conviction but reversed the aggravated assault conviction because the indictments for the offenses were improperly consolidated. A more detailed statement of the facts can be found in this Court's opinion on direct appeal. *Id*.

## II. Post-Conviction Hearing

At the post-conviction hearing, Petitioner testified that while he was in custody for the present offense, he was contacted by federal authorities, and he agreed to work in an undercover drug sting operation at the Shelby County Jail. Petitioner made drug buys from officers and inmates that resulted in the federal indictments against sixteen to eighteen individuals. Petitioner testified the undercover investigation lasted approximately three and a half years, and the trial for his murder case was continued during that time.

Petitioner testified that, as a result of his cooperation with federal authorities, he was placed in protective custody, and he expected to receive some type of offer to settle the murder case. He did not want to go to trial. Petitioner testified that when trial counsel took over his case, trial counsel was aware of his undercover work. He said that trial counsel visited him a couple of times in jail and wanted the federal agents to put a "deal" in writing, but he never received anything. Petitioner testified that trial counsel never discussed any deal that he was trying to procure nor told him of any amount of time that the State had offered. However, he said that on the day of his sentencing hearing, federal agents picked him up at the Tipton County Jail for transportation to Shelby County and told him about a deal that was "in place."

Petitioner testified that at the sentencing hearing, the prosecutor indicated that a substantially reduced offer had been made to Petitioner. The transcript of Petitioner's sentencing hearing contains the following exchange during the cross-examination of Officer Raymond Tilton of the Memphis Police Department by the State's prosecutor:

[Prosecutor]: Are you aware it's a fair statement to say [Petitioner] didn't do this [undercover work in Shelby County Jail] out of the goodness of his heart, did he?

[Officer Tilton]: No, sir. He did it because we told him we'd do what we could to let the Judge know about his assistance to help him out in his sentencing if he was found guilty of the charges against him.

[Prosecutor]: And you are aware that we did take that into consideration and made him a rather substantially reduced offer from the one that he got at trial? You understand that?

[Officer Tilton]: Yes, sir.

[Prosecutor]: And it was his option to go to trial?

[Officer Tilton]: It was his decision to go to trial. But like I say, I told him we would talk to the Judge and let the Judge know what he did for us.

Petitioner testified that he asked trial counsel about the reduced offer and why he had not heard about it. Petitioner testified:

[Trial counsel said] They ain't talking about nothing. I said, "Well, [trial counsel] they'll [sic] talking about something. He just said a reduced offer." And [trial counsel] said, we wasn't talking about that. So once we went to the back, out of the courtroom, I said, [trial counsel] what are they talking about and he said, "Shit, they wasn't talking about shit and I told you we was going to have to go to trial."

Petitioner testified that trial counsel also told him that there was no offer on the table. He said that he was informed by post-conviction counsel that the reduced offer was for twenty-five years. When asked if he would have accepted the offer, Petitioner said, "I think

-3-

so." He further asserted, "I didn't get a chance to consider it, I might have [sic] of." Petitioner testified that the federal agents told him to expect an offer of twelve years.

Petitioner testified that trial counsel met with him four times for a total of two to two and a half hours. He said that trial counsel met with him the day before trial and asked what his defense was going to be. Petitioner told trial counsel that he thought trial counsel had been working on his case for years and that trial counsel should have a defense. He said that he told trial counsel that the case should be postponed because trial counsel did not seem prepared and had not subpoenaed any of the witnesses that Petitioner expected him to call at trial. He said that he asked trial counsel about talking to Mary Walker, the manager of Guns and Ammo, Lieutenant Ronnie Thompson, and Lieutenant Berryhill. Petitioner testified that trial counsel did not want to call Lieutenants Thompson or Berryhill because he did not trust them. He admitted that trial counsel hired "Inquisitor," a private investigation company, to investigate his case, and the names of the witnesses were given to them. Petitioner testified that he met with an investigator from the company several times. Petitioner said,

> They talked to Berryhill and a couple of my witnesses and taken [sic] statements from them. I know that he took a statement from Lisa Milan and I know he took a statement from Mary Walker. I think he met with my mom and took a few statements from my mom and took a statement from C.L. Pratt.

Petitioner testified that his defense would have been that the shooting was an accident and occurred during an argument between the victim, who was his girlfriend, and himself. He said that he wanted to call his wife, Lisa Milan, to testify at trial. Petitioner admitted that he met with the victim while he was married to Ms. Milan. He said that Ms. Milan would have testified that he was not abusive. Petitioner testified that Ms. Milan would have also testified that the victim exhibited violent tendencies toward her, and Ms. Milan would have testified to the victim's violent nature. He said that Ms. Milan gave a written statement to Inquisitor. Petitioner testified that trial counsel never said why he did not want to call Ms. Milan as a witness.

Petitioner felt that trial counsel should have called Peggy Joyner, the mother of two of his children, to testify that he was not abusive. He said that Ms. Joyner knew of his relationship with the victim, and she had witnessed conversations between him and the victim. She had also witnessed an argument between them. Petitioner claimed that when he asked trial counsel about calling Ms. Joyner, trial counsel told him not to question his "strategy." Petitioner testified that he also mentioned Frances Harper's name to trial counsel. Ms. Harper was the mother of Petitioner's oldest son.

-4-

Petitioner testified that the investigators from Inquisitor did not ask witnesses the details of his relationship with the victim or whether she was violent toward him. He said that the investigators asked him about the federal agents and his work history. He also gave them the names and addresses of witnesses. Petitioner testified that he wanted trial counsel to call Johnnie May Williams, a long-time friend of his mother, to testify that he had purchased the victim an engagement ring. He thought that Inquisitor took a statement from Ms. Williams.

Petitioner testified that during trial, the State attempted to show that he and the victim did not have a relationship and that he was trying to stalk her. He said that the characterization was inaccurate because he and the victim had been seeing a relationship counselor, Dr. Camilla Guy, whom he asked trial counsel to call at trial. He said that prior to seeing the counselor, he had attended an anger management class for three to four weeks. Petitioner testified that trial counsel told him that he could not locate Dr. Guy. He said that Dr. Guy was in the car with Lieutenants Thompson and Berryhill when he turned himself in after the shooting and that she rode with him to the police department.

Petitioner testified that he wanted trial counsel to call Lieutenant Berryhill to testify at trial because Petitioner and Lieutenant Berryhill had been friends for fourteen to fifteen years. He also said that he worked with Lieutenant Berryhill on several things. He was also friends with Lieutenant Thompson. Petitioner felt that Lieutenants Berryhill and Thompson could have testified that he was not a violent or abusive person. They were also familiar with his relationship with the victim, and he turned himself in to them after the murder. Petitioner testified that he wanted trial counsel to call his step-father, C.L. Pratt, to testify. He noted that Mr. Pratt had testified at the preliminary hearing. Petitioner testified that Mr. Pratt and Natasha Butler were traveling behind him and the victim when they began arguing, and she was shot. Mr. Pratt then pulled into a nearby Citgo gas station, and he and Ms. Butler were out of the vehicle as the altercation between Petitioner and the victim occurred at the intersection. Petitioner testified that trial counsel refused to call Mr. Pratt or Ms. Butler to testify at trial.

Petitioner testified that he asked trial counsel to contact the manager of Guns and Ammo to obtain receipts to show that the victim had purchased two guns, one of which was similar to the one used in the shooting. He said that trial counsel told him that the manager was out of town. Petitioner said that trial counsel did not request a continuance to obtain the receipts. Defendant then introduced a receipt showing that the victim purchased a Bersa Thunder and a Ruger pistol on June 29, 2002. Petitioner testified that he wanted his mother, Eddie Milan Davis, to be called as a witness to testify concerning his relationship with the victim. He said that Ms. Davis also had personal interaction with the victim.

Petitioner testified that he wanted trial counsel to call his sister, "Q," who worked for a bonding company, to refute the State's proof at trial that the victim did not post his bond for the aggravated assault that occurred on September 26, 2002. He said that his sister would have verified that the victim was the one who actually posted Petitioner's bond for that offense. Petitioner testified that trial counsel told him it was difficult to contact Petitioner and prepare for trial because Petitioner was being moved around to various jails.

On cross-examination, Petitioner acknowledged that he testified at trial and told the jury that the victim was the first aggressor and that she was abusive toward him. He did not recall if he told the jury that he had previously assaulted the victim and was sent to anger management. Petitioner admitted that a number of the witnesses that he wanted trial counsel to call at trial were his family members. He said that his sister, Cosandra Milan, testified at trial and talked about his relationship with the victim. She also talked about how Petitioner admitted to getting into an argument with the victim and "bashing up the phone."

Petitioner admitted that he did not know if the federal agents knew that the State was going to make him a plea offer. He said that approximately one year into his case, they told him that there was going to be an offer of "about twelve years." Petitioner testified that he and trial counsel discussed the twelve-year offer; however, trial counsel said "if it ain't in writing, he wanted them to put it in writing. He said don't believe nothing they say. You can't trust them, we're probably going to trial." Petitioner testified that at the time, he did not understand that the federal agents could not make an offer for the State. Petitioner testified that if all of his witnesses had testified at trial, he felt the outcome of his case would have been different. He was aware that trial counsel received information from Inquisitor concerning their investigation of Petitioner's case. Petitioner testified that after trial, counsel gave Inquisitor permission to send Petitioner the witnesses' statements. Petitioner admitted that he did not know the number of years that the State offered. He only knew that it was "substantially reduced." He said that post-conviction counsel told him that it was twenty-five years. When asked if he would have accepted another plea offer, Petitioner replied, "I don't know what I would have taken, if there was an offer, I didn't even get the opportunity to take anything."

Cosandra Milan, Petitioner's sister, testified that she met with trial counsel two times and discussed Petitioner's case. She testified at Petitioner's trial concerning events that took place prior to the murder. Ms. Milan testified that no one asked her any questions about Petitioner's relationship with the victim. She said that on the day of the murder, she took Petitioner to the victim's house, and they went inside. Ms. Milan testified that the victim was cooking and wearing lingerie, and she and Petitioner began arguing. As they continued arguing, Ms. Milan walked outside, got into her truck, and eventually left. Ms. Milan testified that she drove down Houston Levee Road and pulled over to use her cell phone. She

got out of her truck and walked over to a hill and watched the victim and Petitioner take boxes of beer or wine out of the house and place them in an Escalade. She said that it appeared that the argument had "calmed down."

Ms. Milan testified that she had known the victim for approximately two years, and she had seen the victim act violently toward Petitioner. She said that Petitioner was married at the time he met the victim and that the victim's violence "escalated about the ex-wife and also again about the Escalade truck." Ms. Milan testified that there were always problems between the victim, Petitioner's then wife Lisa Milan, and Peggy Joyner. She said that the victim would get into fights with Petitioner over Ms. Milan and Ms. Joyner, and she would threaten to stab Petitioner with a steak knife. Ms. Milan testified that one day after an argument with Petitioner's ex-wife, the victim said that she was purchasing a gun from Guns and Ammo. Ms. Milan testified that trial counsel never asked her about the arguments between Petitioner's ex-wife and the victim, Ms. Joyner and the victim, or the victim's purchase of weapons. She also was never asked if the victim attempted to kill Petitioner. She did not tell trial counsel about the arguments or the incident with the knife because he did not ask. Ms. Milan testified that she told trial counsel that the victim and Petitioner's relationship started going "bad" after they returned from a cruise. She testified that trial counsel did not inform her that the State was accusing Petitioner of being abusive to the victim. Ms. Milan did not believe that Petitioner abused the victim.

On cross-examination, Ms. Milan testified that she took Petitioner home on the day of the murder and walked inside the apartment with him. She said:

> When we went in the door, I don't know what kind of food, but it was a food smell cooking there. And he was thinking, he was like, she said she ain't here, but we smell food, because he kept calling her to come pick him up. We never could get a response from her. So we went in the house and all you can smell is onions, especially an onion smell of food. So I stood right in the center-way and he went over there and hollered to the bedroom. He come back out and she did and she had on lingerie and they went to arguing from there and I walked back up towards the door and went out the door.

Ms. Milan recalled speaking to someone from Inquisitor and signing a sworn affidavit. In the affidavit, Ms. Milan indicated that she dropped Petitioner off at the apartment and watched him walk inside, but she did not go inside. However, Ms. Milan said that the affidavit was incorrect and that she and Petitioner both went inside. Ms. Milan also testified that Petitioner spoke to the victim by phone, and she told him that she was not at home and that she would call him when she arrived home.

In her sworn affidavit, Ms. Milan said that the victim called Petitioner on the day of the murder and told him that she was not at home. She also said that she thought the victim was upset because she could not locate Petitioner. Ms. Milan admitted that paragraph seven of her affidavit, in which she stated that the victim was angry when Petitioner arrived at the apartment, was completely opposite of her post-conviction testimony in which she testified that Petitioner was angry because the victim was wearing lingerie. Ms. Milan testified that Petitioner was upset because the victim had lied to him concerning her whereabouts.

Charles Pratt, Petitioner's step-father, testified that on the day of the murder, he and Petitioner were supposed to go look at a truck. He said that the victim called him to "come over there and asked me was I still going with [Petitioner]." Mr. Pratt arrived at Petitioner's house between 8:00 and 9:00 a.m. and saw him walking out of the house with the victim. Mr. Pratt briefly spoke with the two, and they seemed to be alright. Mr. Pratt testified that he then left followed by Petitioner and the victim who were in a separate vehicle. He said:

> When I got to the gas station, I seen [Petitioner's] truck pull up and looked like [the victim] was hitting him. But, I had took a girl over to [the victim's] house that [Petitioner] had went to - - me and [Petitioner] had went to St. Louis and I took her and he went with her sister. So I figured that that was what [the victim] was mad about, you know.

Mr. Pratt testified that it appeared Petitioner was trying to pull away from the victim. He then heard one gunshot in the vehicle. Mr. Pratt saw the victim jump out of the truck, and she was "hollering back and cursing." Mr. Pratt testified that the victim slipped or fell to the ground, and Petitioner tried to pick her up. At that point, Mr. Pratt heard another gunshot, and Petitioner stood up, pointed the gun to his head, and then panicked. Mr. Pratt testified that Petitioner looked at him, and "so many people started running from everywhere and [Petitioner] got in his truck and left." Mr. Pratt walked up to the victim, and she asked him to call her mother. He then called for help and called the victim's mother. Mr. Pratt testified that he did not see Petitioner stand over the victim and shoot her nor did he see Petitioner reach down, point the gun directly at the victim, and pull the trigger.

Mr. Pratt testified that he was initially supposed to be a witness for the State. He said that he informed the State that a portion of his written statement was incorrect. Mr. Pratt testified that he met with trial counsel "[a]t least, nine times" and told him exactly what happened. He said that although he testified at the preliminary hearing in Petitioner's case, he was not called to testify at trial. Mr. Pratt testified that his testimony would have differed from witnesses at the scene who testified that Petitioner stood over the victim and shot her. He said that he would have willingly testified if trial counsel had asked him. Mr. Pratt agreed

that his testimony at the preliminary hearing met the State's burden to show probable cause to have Petitioner bound over to the Grand Jury on a charge of first degree murder.

On cross-examination, Mr. Pratt testified that trial counsel said that he planned to call Mr. Pratt to testify at trial. He said that he gave a statement to police on the day of the shooting, which he signed but did not read. He also said that the person who took his statement was the victim's best friend. Mr. Pratt testified that his statement to police indicated that he saw Petitioner with a gun on the day of the murder when Petitioner and the victim walked out of the house and that Petitioner pointed it at the victim. However, he said that portion of his statement was incorrect. Mr. Pratt testified that the remainder his statement was consistent with his post-conviction testimony.

Former Lieutenant, but current Deputy Chief Anthony Berryhill testified that he had known Petitioner for fifteen years or longer, and Petitioner had worked as a "cooperating witness" for several years and was working as such at the time of the murder in this case. Deputy Chief Berryhill testified that he was a member of the Organized Crime Unit at the time. Deputy Chief Berryhill testified that Petitioner turned himself over to Deputy Chief Berryhill and Lieutenant Thompson after the murder, and he said that Petitioner was very cooperative. He did not recall if Petitioner said that the shooting was accidental. Deputy Chief Berryhill testified that he had never known Petitioner to be a violent person although he knew that Petitioner had prior arrests for "assault and that type of thing." He said that he would have testified on Petitioner's behalf at trial if he had been called as a witness.

On cross-examination, Deputy Chief Berryhill testified that he did not make any promises to Petitioner about the outcome of the murder case. He was not aware of Petitioner's history of domestic violence; however, it was "very possible" he knew that Petitioner had been charged with passing worthless checks, a felony charge.

Lieutenant Ronnie Thompson, who was retired from the Memphis Police Department, testified that he first met Petitioner in 1988 or 1989 when Petitioner worked for him as an informant in order to "work off" another criminal offense. Petitioner continued to work as an informant after he successfully "worked off" the first offense. Lieutenant Thompson said that he got to know Petitioner quite well, and he saw Petitioner at least twice a month. He was shocked by the murder charge because he had never seen Petitioner act violently. He said that prior to Petitioner's surrender, Lieutenant Thompson had visited Petitioner's mother's house in an attempt to locate him. Lieutenant Thompson later learned that Petitioner was at another location and was afraid to turn himself in because the SWAT team had the house surrounded. Petitioner requested to turn himself in to Lieutenant Thompson and now Deputy Chief Berryhill. Lieutenant Thompson testified that Petitioner was very cooperative when he turned himself in, and Petitioner said that he had accidently shot the

victim. He said that he visited Petitioner a couple of times in jail after his arrest. Lieutenant Thompson was not aware that Petitioner began working as an informant for the federal authorities in an investigation involving officers and the sale of drugs in the jail and on the penal farm. Lieutenant Thompson testified that he was never contacted by trial counsel to testify about Petitioner's cooperation and that Petitioner was not violent. He said that he would have spoken on Petitioner's behalf at trial. He would also have recommended a reduced sentence for Petitioner.

On cross-examination, Lieutenant Thompson testified that although he looked at Petitioner's criminal history, he was not aware that Petitioner had a history of assault convictions in addition to convictions for disorderly conduct and a number of drug charges. Petitioner was also convicted of violating an order of protection and passing worthless checks. Lieutenant Thompson admitted that Petitioner never told him that he beat up his wife or that he had previously cut the victim across the arm with a knife.

Trial counsel testified that he began representing Petitioner in criminal court, and he later became aware that Petitioner was cooperating with police on an investigation. He said:

> I don't remember if he told me that or not, but I do remember going to visit another client in the jail and there was a policeman down there. And when somebody asked one of the Deputy Jailers asked who is here for Mr. Perkins, and then the client that I went to see said him and Fredrick Milan said he was [sic].

> And then when I saw him I asked why are you here. He said they told me I had an attorney visit. I said on what, and he said I guess it's this. I said well, I'm the only attorney here so you shouldn't be and then that's when the undercover policeman said I'm here to see him, and then we had words about that and I told Mr. Milan not to talk to him and go back upstairs.

Trial counsel testified that he advised Petitioner not to talk with the undercover officer any further because he felt that it was improper for Petitioner to be speaking with officers and federal agents behind his back. Petitioner also said that one of the officers told him that his murder case was "all going to go away."

Trial counsel testified that he investigated Petitioner's case and visited the crime scene. He thought that Inquisitor also worked on the case. Trial counsel testified that Petitioner was actively involved in his representation, and he did not remember if he provided Petitioner with discovery. He said, "Traditionally I try not to give my clients

discovery because I don't want it floating around the jail." Trial counsel testified that if he had a question about something in discovery, he would have asked Petitioner.

Concerning a plea offer, trial counsel testified:

I don't remember if there was an offer or not but I do remember they kept telling him that or he was telling me they told him this was going to go away. If there had been an offer I would have conveyed that offer.

When asked if he always conveyed an offer made by a prosecutor, trial counsel replied, "Definitely, yes." There was "no question" that he would have conveyed a twenty-five-year offer to Petitioner made by the State. When asked about the exchange that occurred at the sentencing hearing about a "substantially reduced offer," trial counsel testified: "It must have been but there was no offer given to me, I mean, that I'm aware of because if I had I would have told him that." Trial counsel further said: "But I don't see how he would make me an offer anyway after we finished the trial. There ain't no offer to be made." He said that Petitioner never mentioned the subject at the sentencing hearing.

Trial counsel testified that Petitioner did not indicate that he wanted to plead guilty rather than go to trial. Trial counsel said:

He wanted to go to see if this was all going to go away as he had been promised that it was going to go away, and we just kept waiting and waiting and waiting. And I think that we got to a point where it was time to fish or cut bait, and we went on to trial.

Trial counsel testified that Petitioner's defense was that he was trying to take the pistol away from the victim, and it accidentally discharged. He said that the primary aggressor issue did not come up at trial "because it didn't matter if we were going - - if we're stating that she was accidentally shot it wouldn't have mattered."

Trial counsel testified that due to Petitioner's undercover work, he was moved to a facility in Tipton County without trial counsel's knowledge. When trial counsel learned that Petitioner was in that facility, he attempted to meet with Petitioner but was not allowed to do so. He eventually traveled to Tipton County three or fours times to meet with Petitioner. Trial counsel thought that he also met with Petitioner the weekend before trial.

Trial counsel felt that he interviewed all of the witnesses that he heard about. Concerning potential witnesses, trial counsel said:

I try to determine if they are going to be helpful, are they going to be beneficial or not. I don't spend a lot of time on witnesses that I don't think that are going to help us, or if the probative value is going to be less than a prejudicial value I don't use them.

Trial counsel testified that he "traditionally" tried not to use family members as witnesses "because the jury tend[s] to believe that they're going to say anything to help their family member." Trial counsel indicated that he did not call Defendant's wife, Lisa Milan, to testify at trial because he was afraid of "what the jury would think about [Petitioner] having a wife and a girlfriend." Petitioner had also been previously accused of assaulting Ms. Milan.

Trial counsel testified that he did not call anyone to testify as to Petitioner's peaceful nature "[b]ecause this was an accident it doesn't make any difference about whether he was peaceful or not in my opinion." When asked if that sort of evidence would have exposed more of Petitioner's past, trial court further testified:

I think it would have because we're not talking about fact witnesses here. I mean, I think that people that we got and it's very, very common for defendants or their families to want to testify that he teaches Sunday school and he goes to church and all that, but by doing that it doesn't help the facts.

It opens him up to character and then they can get - - even if I don't want to put my client on the stand for his record to come in, and usually I don't do that, then if I open up the character the first thing the Prosecution is going to ask well, if you knew he had been arrested for XYZ would you still think he was a good guy, which would get all that information out to the jury and I wouldn't want them to know that.

Trial counsel did not remember talking to Peggy Joyner, the mother of some of Petitioner's other children, or remember why he did not want to call her at trial. He thought that Petitioner still had an active relationship with her, but he could not remember for certain.

Concerning character witnesses, trial counsel testified:

I would not have used - - ordinarily if I'm going to use character witnesses I'll save them until the sentencing stage. I do not want to use character witnesses during the trial. I'll try to restrict everybody that's talking to the facts because the more people you put here in this chair the more opportunities that the State

-12-

will have to cross examine them and get in evidence that ordinarily could not be gotten into.

Trial counsel again explained that the theory of defense was that an accidental shooting occurred inside a vehicle. He said that Petitioner wanted him to call Larry Fitzgerald, an attorney who represented Petitioner on a domestic violence case. Trial counsel did not see how that would have helped Petitioner's case.

Trial counsel could not remember Petitioner asking him to call Johnnie May Williams to testify that Petitioner had purchased an engagement ring for the victim to contradict the State's proof that the victim was engaged to someone else. Trial counsel remembered that Petitioner said that he had purchased a ring and planned to marry the victim; however, trial counsel pointed out that Petitioner was still married to Ms. Milan. Again, trial counsel did not know how Ms. Williams' testimony would be helpful to Petitioner's case, and he did not "know what kind of exposure or question that the DA would have gotten from her based on that hearsay." Trial counsel testified that he would have made a tactical decision not to call her.

Trial counsel testified that it would not have been helpful to call Lieutenant Thompson and Deputy Chief Berryhilll to testify in Petitioner's case because they were not witnesses as to the facts of the incident. He was familiar with Charles Pratt, Petitioner's step-father. Trial counsel testified that he thought Mr. Pratt would have testified concerning Petitioner's relationship with the victim, but he did not see Petitioner take the gun from the victim at the time of the shooting. He noted that Mr. Pratt also could have testified that Petitioner and the victim left the apartment together "but that was not a fact that was in dispute." Mr. Pratt was impeached at the preliminary hearing by a statement that he gave to police.

Trial counsel was aware that the victim had purchased firearms from Guns and Ammo, and he thought that he spoke "to a gun shop owner or something on Winchester or somewhere." Concerning the firearm, trial counsel testified:

If it was not the firearm that was used in the incident I probably would have not called it because it wouldn't have made any difference unless, you know, my theory of defense was that she went in her purse to get a firearm and he was aware that she had it, then I would have . . . .

But I think in this particular case the firearm was between the seats in the Cadillac or Escalade or something, and she got that firearm I believe, and he was attempting to take it from her and it went off. I think that's what I remember.

-13-

Trial counsel was sure that he spoke with Cosandra Milan, Petitioner's sister. He did not feel her testimony at the post-conviction hearing, that she had never seen Petitioner abuse the victim and that she saw Petitioner and the victim loading boxes into the Escalade on the day of the murder, was relevant to the theory of defense. Trial counsel noted that he regretted calling Petitioner to testify at trial. He said:

> Well, because I think that when you try cases we have to take a whole lot of stuff into consideration. One of the things that I take is the body language, especially of the witnesses and the jurors, and I felt pretty comfortable in the trial that I had one or two of the jurors I felt real good about that just watching the body language.

> But - - and I say regrettably because I put Mr. Milan on the stand and I wished that I had not because under cross examination I do believe his testimony was laced with a lot of profanity that the jurors heard and the ones that I felt comfortable with I could see their body language shift based on the language that Mr. Milan was using about this incident. And that kind of destroyed everything.

Trial counsel noted that at the sentencing hearing, he asked Petitioner if there was anything else that he wanted to tell the judge, and Petitioner said, "no." Petitioner did not mention anything about a twenty-five year offer from the State.

On cross-examination, trial counsel testified that a "federal officer" testified at the sentencing hearing about Petitioner's cooperation since his arrest and that his cooperation led to the arrest and convictions of several jailers for smuggling drugs into the Shelby County Jail.

Trial counsel agreed that in his opening statement at trial, he told jurors that Petitioner was married to someone other than the victim. He also told the jury that Petitioner had purchased a Lexus and a ring for the victim. Trial counsel admitted that he told jurors that the victim pulled a gun out of the car and hit Petitioner. He said that Petitioner and the victim were struggling over the gun as Petitioner drove down the street. When they got to the traffic light, Petitioner was holding the victim's hand "ducking and dodging trying to keep her from shooting him while he's holding on to her." Trial counsel further admitted that he told jurors that Petitioner placed the vehicle in park and then snatched the gun from the victim. Petitioner testified at trial that he took out all of his anger, frustration, and passion while the victim was cussing and crying, and Petitioner shot her. Trial counsel remembered talking to Petitioner about him and the victim being in a big fight and struggling over the gun.

-14-

Trial counsel testified that it probably would have been important to show the jury that the gun belonged to the victim. He further agreed that it may have been an important factor that the crime scene officers collected shell casings from a .380 caliber pistol. Trial counsel remembered speaking to someone at Guns and Ammo about the two weapons purchased by the victim prior to the shooting. The receipt for one of the weapons indicated that it was a .380 caliber pistol. Trial counsel did not recall why the owner of the gun shop was not called to testify other than trial counsel was "very hesitant about subpoenaing people that don't want to testify because they'll get on the stand . . . and begin to talk and say things that would be detrimental." He did not recall what, if any, detrimental information the store owner might have had.

Trial counsel acknowledged that Petitioner's reputation for violence was no secret in the case. Concerning this issue, the following exchange took place:

[Trial Counsel]:                   No, I don't - - but I don't remember the trial that way. I remember that they wanted to make a big issue it appears to me and I tried to keep that away because I'm only talking about what happened in the car. I didn't want to get into all this other stuff because I thought it was more prejudicial than probative.

[Post-conviction Counsel]:     Well, let me - - okay. So that's - - let me ask you this then because you're saying, you're telling us that's how you remember the case. Well, if an issue was there in Mr. Milan's case concerning - - and the issue of violence is already out there, there's nothing to hide with regards to being violent, and that part of the facts in the case is whether or not this is the victim's gun and she was the primary aggressor would it not be relevant then in your defense to show that the victim was the violent individual in the relationship?

[Trial Counsel]:                   I don't know because I can't remember exactly what I had planned or how  - - what my theory and theme of the case was.

-15-

|  | I do remember talking about the violence - - I mean, the trauma in the relationship and that was my attempt to defuse any of that and to show that he was actually in love with this woman, he would not have harmed her. I do remember doing that in opening. And that's why I did it. |
|---|---|
|  | But I didn't want to continue to remind the jury that they had been fighting or they fought often or whatever. |
| [Post-conviction Counsel]: | So if the Prosecution was doing it time and time with the witnesses your strategy in this situation was to not confront that issue and try to not let the jury hear any more about it? |
| [Trial Counsel]: | No. No. If - - if the Prosecution did that then my strategy would have been to try to discredit that witness on the stand and their testimony, maybe not discredit it but to talk about the good things that he had also done or had. |

Trial counsel was aware that Mr. Pratt knew Petitioner well. Although Mr. Pratt was parked at a gas station and witnessed what happened at the intersection, he did not see what happened inside the vehicle between the victim and Petitioner. Trial counsel testified that he would not have called Mr. Pratt as a witness if his credibility could have been challenged. He said that he did not call Mr. Pratt "because he could not testify as to the events." Trial counsel agreed that Mr. Pratt told police that he saw Petitioner and the victim in the vehicle, he saw several shots fired, and he saw them outside the vehicle." However, he said that Mr. Pratt's statement was inconsistent with the theory of defense. Trial counsel said:

Our thing was, and I do remember talking about that and Mr. Milan states that he took the gun from her in the car, so he could not have seen - - this is not consistent.

He says here he saw her jumping out of the truck and then he saw him get out of the truck with the gun and then he went over to where she was and shot.

-16-

Trial counsel acknowledged there was nothing in Mr. Pratt's statement indicating that Petitioner stood over the victim and fired shots into her "execution style." Trial counsel acknowledged that a couple of witnesses testified that Petitioner "virtually" stood over the victim and fired shots into her body. He acknowledged that the witnesses' testimony was inconsistent with that of Mr. Pratt and of the medical examiner who testified at trial that the victim did not appear to have any gunshot wounds to the front of her chest fired from a close range while she was on the ground.

Trial counsel testified that it was hard to prepare for trial because Petitioner was moved to different places of incarceration. He said that Petitioner did not seem concerned with his case because officers told him that the murder charge would "go away" due to his cooperation. Trial counsel testified that he told Petitioner not to put any faith in a deal that was made without counsel, and "if I didn't present it to him there was none." He said:

> But they kept convincing him and even after I told this guy, whoever he was, to leave and not talk to Mr. Milan well naturally I couldn't force him to do that but I did tell Mr. Milan to go back upstairs and not talk to him.
>
> And I think he might have gone - - I know he left but he might have come back, I don't know. But the thing was that I was afraid of that they would convince him to continue to do this stuff in the jail which was very, very, very dangerous, that this murder case would go away. And I think that he honestly believed that this was going to go away.

Trial counsel admitted that he never contacted the FBI about Petitioner. He said that normally if a client wanted to cooperate with the federal government, he would arrange the meetings and be present when officials spoke with the client. Trial counsel said that it would be extremely important in that situation to meet with the U.S. Attorney who could help with the case. Trial counsel testified that he knew Petitioner was cooperating with the federal authorities and being used as an undercover informant to run drugs in and out of the jail at 201 Poplar Avenue. Trial counsel said that when he found out Petitioner was talking to federal authorities, he told Petitioner not to talk with them anymore without him present. He told Petitioner to give him the name and phone number of anyone else who attempted to speak with Petitioner, and trial counsel would contact them to set up a meeting. Trial counsel testified that he did not make any effort to contact the FBI, U.S. Attorney's Office, or the prosecutor about Petitioner's cooperation.

Trial counsel remembered Petitioner said that he turned himself in to Lieutenant Thompson and Deputy Chief Berryhill. He did not recall that Petitioner asked him to call the two officers to testify at trial. Trial counsel did not recall knowing that Petitioner had been

working with them as an informant since 1988. Trial counsel testified that he learned "just before the trial or during the trial" the extent of Petitioner's cooperation with the federal authorities. He did not know that Petitioner's trial was postponed until after the officers were prosecuted in federal court. Trial counsel also testified that he did not know that Petitioner was the person who testified against the officers. He said that when he found out that Petitioner was being moved around to different facilities, he was concerned more about Petitioner's safety than making a deal. Trial counsel testified that when he inquired about Petitioner being moved, no one knew why he was being moved. He thought that Petitioner told him about Officer Russ Tilton who was called to testify at the sentencing hearing.

On redirect examination, trial counsel testified that the murder in this case happened while Petitioner was out on bond for aggravated assault against the victim. He agreed that the State had a high interest in prosecuting Petitioner. Trial counsel did not recall any plea offer made to Petitioner, and he would have conveyed any offer to Petitioner if there had been one. Trial counsel testified that he had never had a murder case dismissed because a defendant cooperated with the federal authorities. He did not see how Lieutenant Thompson's or Deputy Chief Berryhill's testimony would have been helpful at trial or in negotiating with the federal authorities. Concerning Charles Pratt, trial counsel testified that Mr. Pratt would have easily been impeached at trial because his statement to police indicated that he saw Defendant get out of the vehicle with the gun. However, he later said that he never told that to the officer who took his statement. He also claimed that the officer was the victim's best friend.

## III. Standard of Review

On appeal, Petitioner asserts that he received ineffective assistance of counsel because trial counsel failed to convey a twenty-five-year offer by the State and trial counsel failed to call Charles Pratt, Lieutenant Thompson, and Deputy Chief Berryhill to testify at trial. He further asserts that trial counsel failed to "properly question" Petitioner's sister, Cosandra Milan, at trial or present proof that the victim purchased two guns from Guns and Ammo.

In a claim for post-conviction relief, the petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. Petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). The post-conviction court's factual findings "are conclusive on appeal unless the evidence preponderates against those findings." *Jaco v. State,* 120 S.W.3d 828, 830 (Tenn. 2003). Upon review, this court will not reweigh or reevaluate the evidence below, and all questions concerning the credibility of witnesses, the weight and

value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court, not this court. *Momon v. State*, 18 S.W.3d 152,156 (Tenn. 1999).

On appeal, the post-conviction court's findings of fact are entitled to substantial deference and are given the weight of a jury verdict. They are conclusive unless the evidence preponderates against them. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). A post-conviction court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). Our supreme court has "determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact, ... thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief based on the alleged ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient, and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

First, Petitioner argues that trial counsel failed to properly convey an alleged twenty-five-year plea offer by the State. Concerning this issue, the post-conviction court found:

The Petitioner testified at the Post-Conviction hearing. In summary, he contends that his history of cooperation with police to "work off" drug charges, coupled with his role as a undercover agent/cooperating individual in a federal investigation into the Shelby County Jail should have resulted in his having a favorable negotiated plea agreement. Petitioner was unclear as to what it should be but thought it should be "less than twenty-five years."

Petitioner additionally believes that his trial attorney, [ ], should have been able to demonstrate to the jury that he should not have been convicted of First Degree Murder.

Petitioner testified about, and called witnesses to support, his cooperation with authorities while this case was pending. Apparently, Petitioner had been a "cooperating individual" in previous narcotics cases. Once in jail on this murder charge, he began working with members of an FBI task force investigating corruption in the Shelby County Jail. Petitioner was a pivotal witness in a matter which resulted in the indictment by the federal government of a large number of deputy jailers and inmates on a variety of charges. Petitioner apparently kept the fact of his cooperation a secret, even from his attorney. Petitioner is adamant that the individuals he was working for told him these charges would "go away." At the very least, Petitioner claims he would receive twelve (12) years for the murder.

Trial counsel testified that he learned of his client's cooperation by accident. [Trial counsel] saw an undercover police officer waiting to visit his client in jail. Trial counsel was angry that his client was being interviewed without his being notified, and he instructed his client not to communicate with others without the presence of his attorney.

Petitioner's attorney was aware that Petitioner thought he was going to receive some favorable resolution, but that he was not so sure . . . . There is a reference at Petitioner's sentencing hearing (Exhibit #3 at page 14) to there having been a "substantially reduced offer having been made to Petitioner," which was not accepted.

The details of that offer are not clear. What is clear is that Petitioner expected that his cooperation with the federal officers would result in either dismissal of his charges or something approaching that. It is further clear that whatever the reduction that was conveyed to Petitioner was not agreeable to Petitioner who then exercised his right to proceed to trial.

The post-conviction court further concluded:

> Petitioner remains convinced that his cooperation with the federal government should have been rewarded more substantially than was offered. He repeatedly asserts that he was told that his case would "go away."
>
> Petitioner was indicted for First Degree Murder and chose to exercise his right to a jury trial when he did not get the offer he expected. He believes that his attorney was at fault when the jury did not accept his explanation that the shooting was basically the victim's fault.
>
> The burden of proof is on the Petitioner to establish that his attorney's performance was deficient, and that this deficiency adversely affected his defense. *Strickland vs. Washington*, 466 U.S. 668 (1984).
>
> In this case, Petitioner excluded his trial attorney from his communications with federal officers, preferring to deal with them on his own. When the desired result did not materialize, he cannot now blame his attorney.

The record in this case supports the post-conviction court's findings, with the exception of the court's finding that trial counsel communicated any plea offers by the State to Petitioner and that Petitioner rejected all offers. (This was omitted from the quote of the findings). Trial counsel did not recall a plea offer, but said if there had been a twenty-five-year offer, there was "no question" that he would have conveyed it to Petitioner. He remembered that Petitioner was not concerned about his case because he claimed that he was told that the case would "go away" due to his cooperation with federal authorities. Petitioner also said that he had been told to expect an offer of twelve years. When asked about the exchange that occurred at the sentencing hearing about a "substantially reduced offer," trial counsel testified: "It must have been but there was no offer given to me, I mean, that I'm aware of because if I had I would have told him that." Trial counsel further said: "But I don't' see how he would make me an offer anyway after we finished the trial. There ain't no offer to be made." He said that Petitioner never mentioned the subject at the sentencing hearing. Trial counsel further testified that Petitioner did not indicate that he wanted to plead guilty rather than go to trial.

Additionally, Petitioner did not testify that he would have accepted a twenty-five-year offer if one had been made. When asked at the post-conviction hearing if he would have accepted the offer, Petitioner said, "I think so." He further asserted, "I didn't get a chance to consider it, I might have of [sic]." Petitioner did not call any witnesses at the post-conviction hearing, including the prosecutor who handled the case, who testified as to any

offer made to Petitioner. We note that Petitioner indicated at the post-conviction hearing that he had been represented by at least four other attorneys in addition to trial counsel. The record does not reflect that a plea offer was conveyed to one of the other attorneys.

 Petitioner has not shown by clear and convincing evidence that a twenty-five-year offer was made by the State, and he is not entitled to relief on this issue.

Next, Petitioner contends that trial counsel was ineffective for failing to call his step-father, Charles Pratt, and Lieutenant Ronnie Thompson, and Deputy Chief Anthony Berryhill to testify on his behalf at trial. He further asserts that trial counsel failed to properly examine his sister, Cosandra Milan, at trial and failed to present proof from Guns and Ammo to show that the murder weapon was purchased by the victim.

Concerning this issue, the post-conviction court found:

> The second group of complaints about his trial counsel centered on the conduct of the trial. Petitioner testified at the trial that the killing was basically an accident during an argument. Eye witness testimony described how Petitioner stopped the vehicle he was driving and shot the victim. As the victim walked away from the vehicle the Petitioner shot her again, this time in the back. He stood over her and fired a final shot into her as she lay in the street. *State of Tennessee vs. Milan* (supra) at page 13.
>
> *   *   *
>
> Trial counsel had the help of a private investigator in preparing this matter for trial. The strategy throughout was that the initial shooting was an accident. Trial counsel testified that this was the theory that was based upon the statement given to police by the Petitioner. Additionally, trial counsel noted that claiming "self-defense" and attempting to portray the victim as "first aggressor" would have opened up a variety of acts by the Petitioner that would not otherwise be relevant. Petitioner, nevertheless, wanted witnesses called that his attorney knew would not support their defense. Trial counsel testified that he did not think it would help the case to establish that Petitioner was married, and that [the] victim was one of at least two girlfriends.
>
> *   *   *
>
> Petitioner now complains that someone from the gun store (Guns and Ammo) was not called to show that [t]he victim purchased a gun similar to the one she

was killed with. The actual murder weapon was not recovered. This would not have been relevant when Petitioner's defense was that the shooting was accidental when he was trying to take a gun away from the victim.

Petitioner also called a witness at the hearing, C.L. Pratt. Mr. Pratt is married to Petitioner's mother. He testified that on the day of the shooting he was in a car nearby. He testified that he heard a gunshot, and that victim "slipped and fell." When Petitioner tried to pick [the] victim up - another shot was heard. He heard a final shot as Petitioner bent down to the victim. He denied that Petitioner "stood over her and shot her."

Mr. Pratt claims that the statement he gave to the police (exhibit #4) was inaccurate. He maintains that the police added the details that were unfavorable to Petitioner. In reading the statement, it is clear why trial counsel would not have called Mr. Pratt as a witness on Petitioner's behalf.

Mr. Pratt did testify for the State at Petitioner's Preliminary examination. At the Post-Conviction Hearing the Petitioner also called two Memphis Police Department officers (one of whom is now retired). These officers both testified of their history of using Petitioner as a "snitch." They were also instrumental in Petitioner's arrest, since he called them and turned himself into [sic] them after the shooting.

Neither of these officers were aware of the federal investigation that went on during Petitioner's incarceration. Both officers expressed surprise at the murder charge since neither had seen the "violent side" of Petitioner and were seemingly unaware of Petitioner's convictions for Assault or for the facts surrounding these cases.

The record in this case does not preponderate against the trial court's findings. Trial counsel testified that he "traditionally" tried not to use family members as witnesses "because the jury tend[s] to believe that they're going to say anything to help their family member." Trial counsel testified that he did not call anyone to testify as to Petitioner's peaceful nature "[b]ecause this was an accident it doesn't make any difference about whether he was peaceful or not in my opinion." He further felt that sort of evidence would have exposed more of Petitioner's past. Trial counsel explained that the theory of defense was that an accidental shooting occurred inside a vehicle.

Trial counsel was aware that the victim had purchased firearms from Guns and Ammo, and he thought that he spoke "to a gun shop owner or something on Winchester or

somewhere." Although trial counsel testified that it probably would have been important to show the jury that the victim purchased a gun similar to the one that she was shot with, he also said that it would not have made a difference in the case given the theory of defense. We agree. Petitioner's defense and testimony at trial was that he took the gun away from the victim and accidently shot her. Proof that the victim had previously purchased a similar gun would have made absolutely no difference in this case given the fact that after the victim was shot in the vehicle, Petitioner then shot her in the back as she stood unarmed in the street, and he stood over her and shot her again as she lay helpless on the ground.

Trial counsel was sure that he spoke with Cosandra Milan, Petitioner's sister. He did not feel her testimony at the post-conviction hearing, that she had never seen Petitioner abuse the victim, was relevant to the theory of defense. Ms. Milan testified at the post-conviction hearing that she never told trial counsel about incidents of violence or threats of violence by the victim against Petitioner because he did not ask. However, she then said that she told trial counsel that the victim and Petitioner's relationship started going "bad" after they returned from a cruise. Ms. Milan's testimony at the post-conviction hearing contradicted her trial testimony and a sworn affidavit given to Inquisitor. At trial and in the affidavit, she said that she dropped Petitioner off at his apartment on the day of the murder and waited outside; however, at the post-conviction hearing, Ms. Milan testified that she went inside the apartment with Petitioner and that he was mad because the victim was cooking and wearing lingerie. She said that she then went back out to her vehicle and waited for Petitioner. In her sworn affidavit, Ms. Milan also said that the victim called Petitioner on the day of the murder and told him that she was not at home. She also said that she thought the victim was upset because she could not locate Petitioner. Ms. Milan admitted that paragraph seven of her affidavit, where she stated that the victim was angry when Petitioner arrived at the apartment, was completely opposite of her post-conviction testimony in which she testified that Petitioner was angry because the victim was wearing lingerie. Ms. Milan testified that Defendant was upset because the victim had lied to him about her whereabouts. She claimed that the affidavit was incorrect. As pointed out by the State, Ms. Milan's contradictory testimony would have done nothing to help Petitioner's case.

Trial counsel testified that he thought Charles Pratt, Petitioner's step-father, would have testified concerning Petitioner's relationship with the victim, but Mr. Pratt did not see Petitioner take the gun from the victim at the time of the shooting. He noted that Mr. Pratt also could have testified that Petitioner and victim left the apartment together "but that was not a fact that was in dispute." He noted that Mr. Pratt was impeached at the preliminary hearing by a statement that he gave to police indicating that he saw Petitioner point a gun at the victim as they left the apartment before the murder. Although Mr. Pratt was parked at a gas station and witnessed what happened at the intersection, he did not see what happened inside the vehicle between the victim and Petitioner. Trial counsel testified that he would not

have called Mr. Pratt as a witness if his credibility could have been challenged. He also said that he did not call Mr. Pratt "because he could not testify as to the events." He further noted that Mr. Pratt indicated that he heard two shots, which was contradicted by other witnesses and the medical examiner who testified that the victim was shot at least three, and possibly four times. Although there was nothing in Mr. Pratt's statement indicating that Petitioner stood over the victim and fired shots into her "execution style," trial counsel acknowledged that three other witnesses, not related to Petitioner, testified that Petitioner "virtually" stood over the victim and fired shots into her body. Trial counsel testified that Mr. Pratt would have easily been impeached at trial because of his statement to police. We conclude that trial counsel made a sound strategic decision not to call Mr. Pratt as a witness.

Trial counsel remembered Petitioner saying that he turned himself in to Lieutenant Thompson and Deputy Chief Berryhill after the murder. However, he did not recall Petitioner asking him to call the two officers to testify at trial. Lieutenant Thompson testified that it was not until the SWAT team had surrounded the house where Petitioner was staying that Petitioner called him and Deputy Chief Berryhill about surrendering. Trial counsel did not recall knowing that Petitioner had been working with the two officers as an informant since 1988. He testified that it would not have been helpful to call Lieutenant Thompson and Deputy Chief Berryhilll to testify in Petitioner's case because they were not fact witnesses. Again, as pointed out by the State, neither of the officers in question was at the scene at the time of the murder. Although the two officers would have testified that they had never witnessed Petitioner act violently, this was not relevant to the defense theory utilized by trial counsel.

We conclude that Petitioner has failed to show by clear and convincing evidence that he received ineffective assistance of counsel or that he was prejudiced by any alleged deficiencies in counsel's representation. Petitioner is not entitled to relief in this appeal.

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE